KAHN, APPELLEE, *v.* KAHN, APPELLANT.

(No. 10351—Decided December 9, 1987.)

*Smith & Schnacke* and *Lloyd H. O'Hara,* for appellee.

*Hockman & Horwitz, James B. Hockman* and *Jeffrey P. Startzman,* for appellant.

BROGAN, J. This appeal emanates from a bench trial conducted in the Court of Common Pleas of Montgomery County, Ohio, Division of Domestic Relations, on the plaintiff's (Mrs. Kahn's) complaint for divorce from the defendant (Dr. Kahn). Said divorce was granted by the trial court and such grant is not an issue in this appeal. Defendant asserts four assignments of error dealing with the division of property and the award of alimony in the decree.

At the time of the marriage in December 1979, Kathy J. Kahn was in training to become a nurse in Toledo. She continued her training after the couple married and moved to Dayton. In 1983, Mrs. Kahn completed her training and became employed as a nurse.

Prior to the marriage, Dr. Ronald S. Kahn had obtained a degree as a family practitioner and became licensed and board certified as a physician. He owned substantial assets in the form of real estate, two paid-for automobiles and some household goods and furniture. Dr. Kahn also had four savings accounts with a total balance of $28,520.25. Upon marriage and the subsequent move from Toledo to Dayton, Dr. Kahn sold his real estate for $13,738.64 and deposited this sum along with the $28,520.25 into various joint bank accounts with his wife.

In January 1981, the parties purchased a home in Dayton using money from various accounts for a down payment. This house was placed in the names of both parties as joint tenants.

Dr. Kahn began a family medical practice in Dayton in 1981 as sole practitioner. In 1984 and 1985, Dr. Kahn's annual earnings after expenses totaled

$129,000 and $136,000, respectively. Mrs. Kahn's gross earnings for each of those same two years was $21,000.

The plaintiff filed a complaint for divorce on March 17, 1986. After each party filed an affidavit as to income and expenses, a temporary order under Civ. R. 75(M) was entered on April 10, 1986. The order required that defendant pay to plaintiff by way of temporary alimony, the sum of $150 to be applied toward plaintiff's expenses of suit.

It was further ordered that defendant shall pay to plaintiff, by way of temporary alimony, the sum of $2,337 per month beginning with the month of April 1986. If plaintiff chose to reside in the marital residence, defendant had the right, option and privilege of discharging this monthly alimony by paying the mortgage/rent (including taxes and insurance), and basic utilities of the marital residence. If plaintiff chose not to reside in the marital residence, then defendant would pay the monthly alimony through the offices of plaintiff's counsel.

At trial, a substantial amount of time was spent in an effort to place a value on the defendant's medical practice. The practice was agreedly marital property and would be divided equally between the parties. Three separate experts testified as to the value of the practice but they could not agree on the value of the intangible asset of goodwill that should be attached to the practice. The plaintiff's experts believed goodwill to be a factor in the valuation of the practice while the defendant's expert did not. Based on all three of the experts' testimonies, the trial court decided that goodwill was a factor in valuing the practice and found the value of the goodwill in Dr. Kahn's medical practice to be $68,000.

The appellant's first assignment of error states that the trial court abused its discretion in improperly valuing the appellant's medical practice and, by so doing, duplicating the appellant's earning abilities. The dispute centers around the assigning of a value to the goodwill of the practice before determining the overall value of the practice in order to divide it between the parties. The appellant contends that the calculation of the goodwill associated with a medical practice substantially includes the future earnings capacity of the professional spouse which is again taken into consideration when calculating sustenance alimony under R.C. 3105.18(B).[1] The appellant contends that this results in a double

---

[1] R.C. 3105.18 reads as follows:

"(A) In a divorce, dissolution of marriage, or alimony proceedings, the court of common pleas may allow alimony as it deems reasonable to either party.

"The alimony may be allowed in real or personal property, or both, or by decreeing a sum of money, payable either in gross or by installments, as the court deems equitable.

"(B) In determining whether alimony is necessary, and in determining the nature, amount, and manner of payment of alimony, the court shall consider all relevant factors, including:

"(1) The relative earning abilities of the parties;

"(2) The ages, and the physical and emotional conditions of the parties:

"(3) The retirement benefits of the parties;

"(4) The expectancies and inheritances of the parties;

"(5) The duration of the marriage;

"(6) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;

"(7) The standard of living of the parties established during the marriage;

"(8) The relative extent of education of the parties;

"(9) The relative assets and liabilities of the parties;

counting of assets. The appellant relies for support on the case of *Flexman* v. *Flexman* (Aug. 28, 1985), Montgomery App. No. 8834, unreported, where this court rejected the use of goodwill as an asset of a professional practice in a divorce case in reliance on a previous appellate court decision in *Spayd* v. *Turner, Granzow & Hollenkamp* (Mar. 28, 1984), Montgomery App. No. 8310, unreported. The Ohio Supreme Court has not addressed the issue of goodwill in valuing professional practices in divorce proceedings. However, the Ohio Supreme Court addressed the goodwill issue with regard to the dissolution of professional practices when it overturned this appellate court in *Spayd* v. *Turner, Granzow & Hollenkamp* (1985), 19 Ohio St. 3d 55, 19 OBR 54, 482 N.E. 2d 1232. The new *Spayd* decision brings Ohio in line with the majority of states which recognize goodwill in valuing professional practices. Therefore, this court feels that it must now decide the issue of including goodwill in the valuation of professional practices for divorce cases in light of the Ohio Supreme Court's position with regard to dissolution of professional practices cases.

In *Spayd,* the Ohio Supreme Court stated:

"The comprehensive definition of 'goodwill' is 'the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.' Story, Commentaries on the Law of Partnership (6 Ed. 1868) 170, Section 99. See, also, *Metro. Natl. Bank* v. *St. Louis Dispatch Co.* (1893), 149 U.S. 436; 38 American Jurisprudence 2d (1968) 912, Good Will, Section 1. A much narrower definition has been stated as the probability that the old customers will resort to the old place. *Mattis* v. *Lally* (1951), 138 Conn. 51, 54, 82 A. 2d 155, 156." *Id.* at 59-60, 19 OBR at 58, 482 N.E. 2d at 1236.

From an economic standpoint, goodwill is the value of a business or practice that exceeds the combined value of the physical assets. 2 Rutkin, Valuation and Distribution of Marital Property (1987), Section 23.04[1]. This goes beyond the mere future earnings capacity of a sole practitioner.

" 'Future earnings capacity *per se* is not goodwill. However, when that future earning capacity has been enhanced because reputation leads to probable future patronage from existing and potential clients, goodwill may exist and have value. * * *' " *Spayd* (19 Ohio St. 3d), at 63, 19 OBR at 61, 482 N.E. 2d at 1239 (citing *Dugan* v. *Dugan* [1983], 92 N.J. 423, 433, 457 A. 2d 1, 6).

Therefore, a court may consider both future earnings capacity and professional goodwill without being accused of considering exactly the same assets twice.

Another reason to dismiss the double-counting theory rests in the

---

"(10) The property brought to the marriage by either party;

"(11) The contribution of a spouse as homemaker.

"(C) In an action brought solely for an order for alimony under section 3105.17 of the Revised Code, any continuing order for periodic payments of money entered pursuant to this section is subject to further order of the court upon changed circumstances of either party."

fact that it is an accepted accounting practice when other income-producing assets are considered. There is nothing improper about treating an asset as marital property, assigning it to one spouse pursuant to a property division and then, if the asset is income-producing, to count it again for support purposes when assessing each spouse's needs and ability to pay spousal support. 2 Rutkin, *supra,* at Section 23.04[2].

"Accounts receivable generate future income in the same fashion as does goodwill, and, therefore, if there is double counting for one there must be double counting for the other. * * * [Also] many assets which are commonly valued in allocating marital property also generate future income, such as securities, rental property and other income producing investments, and the [Illinois] courts have never hesitated in considering their income production both as value and under * * * [the Illinois equivalent of the considerations at R.C. 3105.18(B)]." Davis, Valuation of Professional Practices in Dissolution Cases (Sept. 1985), 74 Ill. B.J. 16.

The problem results from the inability of many commentators to conceptualize the property division process as containing two steps. First, place a value on the property to be able to divide it and, second, distribute the property fairly based on the statutory considerations. In the first step, goodwill is treated as any other asset of the practice in giving the practice a monetary value. In the second step, all income-producing assets are considered, along with all other statutory considerations, to decide which assets should be given to which party.

Another contention of the appellant is that by placing a value on the goodwill of a professional practice that we are placing a value on the defendant's medical degree. The Ohio Supreme Court has told us that "a professional degree cannot be categorized as 'property.'" *Stevens* v. *Stevens* (1986), 23 Ohio St. 3d 115, 117, 23 OBR 273, 274-275, 492 N.E. 2d 131, 133. Looking back at the definitions of "goodwill" previously presented shows that much more than the degree is valued in a goodwill calculation. Goodwill is an intangible value of an ongoing medical practice. An ongoing sole professional medical practice, by definition, requires a professional physician with a degree, since it would be both unethical and illegal to have an uneducated or unlicensed doctor practicing medicine as sole practitioner. Furthermore, the value of goodwill can be calculated independently of the value of the degree.

"A professional may not have any goodwill; for example, he may just be starting his practice or he may be a salaried employee. Yet, his professional degree and his license to practice are of substantial economic benefit to him." Kennedy & Thomas, Putting a Value on: Education and Professional Goodwill (1979), 2 Family Advocate 3, 5.

Since goodwill can be calculated independently of the value of the degree it is erroneous to assume that by placing a value on the goodwill of a medical practice that we are treating the medical degree as marital property.

We, like the trial court, recognize that goodwill is an integral part of the valuation of a professional business in a divorce proceeding. Since the trial court had the ability to weigh the expert testimony as to the value of goodwill in the practice of the defendant and thereafter place a value on that goodwill reasonably supported by that testimony, we cannot find the trial court's valuation of the medical practice as unreasonable, arbitrary or unconscionable. Therefore, we overrule

the appellant's first assignment of error.

The appellant's second assignment of error states that the trial court abused its discretion in decreeing as marital assets those assets which can be specifically traced to the appellant before the marriage.

In reviewing any division of property pursuant to a divorce, the Ohio Supreme Court's decision in *Cherry* v. *Cherry* (1981), 66 Ohio St. 2d 348, 20 O.O. 3d 318, 421 N.E. 2d 1293, provides the framework for our analysis. In the syllabus to that decision, the court stated:

"1. There is no presumption, rebuttable or irrebuttable, that marital property be divided equally upon divorce; rather, a potentially equal division should be the starting point of the trial court's analysis before it considers the factors listed in R.C. 3105.18 and all other relevant factors. * * *

"2. A Court of Common Pleas has broad discretion to determine what property division is equitable in a divorce proceeding. The mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion." See, also, *Koegel* v. *Koegel* (1982), 69 Ohio St. 2d 355, 23 O.O. 3d 320, 432 N.E. 2d 206; *Berish* v. *Berish* (1982), 69 Ohio St. 2d 318, 23 O.O. 3d 296, 432 N.E. 2d 183.

In a later decision, *Blakemore* v. *Blakemore* (1983), 5 Ohio St. 3d 217, 5 OBR 481, 450 N.E. 2d 1140, the court held that in order to find an abuse of discretion, a court of review must find that the trial court's attitude was " 'unreasonable, arbitrary or unconscionable.' " *Id.* at 219, 5 OBR at 482, 450 N.E. 2d at 1142.

See, also, *Briganti* v. *Briganti* (1984), 9 Ohio St. 3d 220, 9 OBR 529, 459 N.E. 2d 896; *Teeter* v. *Teeter* (1985), 18 Ohio St. 3d 76, 18 OBR 106, 479 N.E. 2d 890.

As *Cherry* and its progeny make clear, courts of common pleas in Ohio have great leeway in the creation of equitable property divisions. A court of review cannot supplant a trial court's determination without a clear showing by the complaining party that the court abused its discretion. *Zimmie* v. *Zimmie* (1984), 11 Ohio St. 3d 94, 11 OBR 396, 464 N.E. 2d 142. We must keep this policy firmly in mind as we analyze the appellant's claim that the trial court's property division with regard to the defendant's premarital property amounted to an abuse of discretion.

It is undisputed that prior to the parties' marriage, Dr. Kahn owned approximately $42,000 in assets which he brought to the marriage. Upon moving to Dayton from Toledo, the defendant took his money and deposited it into various joint savings accounts with his new bride. At the time of trial, these accounts still contained well over the $42,258.89 (the sum of the four bank accounts plus the proceeds from the Toledo real estate) that the defendant can trace back before the marriage even though it is intermingled with joint marital funds.

In determining the split of property in a divorce case, Ohio courts look at the "source of funds" to trace property back before the marriage. *Robinson* v. *Robinson* (May 5, 1986), Montgomery App. No. 9583, unreported; and *Maurer* v. *Maurer* (Mar. 13, 1987), Montgomery App. No. 10029, unreported. This source-of-funds rule is one of the many factors that must be considered when determining alimony. R.C. 3105.18(B)(10). This rule is favored over the blind application of a rule that states where property is placed in joint title, it is presumed to be a gift from one spouse to the other. A steadfast rule resulting in a gift to one spouse every time property is titled jointly encourages married couples to isolate separate property in contemplation of divorce.

"This type of 'divorce planning' could have a detrimental impact upon the marital relationship. If the right to hold separate property is to be meaningful, the characterization of property as marital or nonmarital depends upon the source of contributions as payments are made, rather than the time at which legal or equitable title to or possession of the property is obtained. A source-of-funds theory enables the court to examine several equitable considerations, for example:

"a. The source of funds, if any, used to acquire the property.

"b. The circumstances surrounding the acquisition of the property.

"c. The dates of the marriage, the acquisition of the property, the transmutation and the breakup of the marriage.

"d. The inducement for and/or purpose of the transaction which gave rise to transmutation.

"e. The value of the property and its significance to the parties. *See,* Principles and Guidelines for the Revision of Property in Actions for Divorce in Ohio, 54 Ohio Bar No. 11, 491, 501." *Maurer, supra,* at 8-9.

Therefore, before a court makes the decision to convert or "transmute" property from non-marital to marital, the court must remember that "equitable principles take precedence over the technicalities of the transmutation." *Dunlap* v. *Dunlap* (Sept. 28, 1984), Warren App. No. CA83-09-063, at 6. Just because the funds of Dr. Kahn were placed in joint accounts upon marriage does not give the trial court the ability to overlook their premarital source. In *Sanzenbacher* v. *Sanzenbacher* (1981), 3 Ohio App. 3d 180, 3 OBR 206, 444 N.E. 2d 454, the court of appeals held that in determining the division of property in divorce proceedings, the fact that certain property was brought into the marriage by one party is not necessarily determinative of the disposition of said property but should be *considered* in relation to all other relevant factors, including those specifically set forth in R.C. 3105.18.

An examination of the court's decision clearly indicates the court failed to consider the premarital assets of the defendant before the division of the parties' marital assets was made. Once consideration is given these assets, the court should then make the appropriate division of property. The appellant's second assignment of error is sustained.

The appellant's third assignment of error states that the trial court abused its discretion in ordering appellant to pay sustenance alimony greater than the future needs of the appellee, especially considering appellee is fully employed and was awarded monetary assets totaling at least $119,000.

We reiterate the standard once again, that the appellant must show that the award of sustenance alimony is unreasonable, arbitrary, or unconsionable before this court may overturn that award. In *Wolfe* v. *Wolfe* (1976), 46 Ohio St. 2d 399, 75 O.O. 2d 474, 350 N.E. 2d 413, the Ohio Supreme Court held, *inter alia,* that an alimony award which constitutes a division of the marital assets and liabilities is not subject to modification under the continuing jurisdiction of the court. The court made some interesting observations concerning alimony in the nature of a property division and sustenance alimony. Justice William B. Brown noted:

"The courts of this state have always derived the power to award 'alimony' from the statutory law. The current provisions of R.C. 3105.18 set forth an 11-factor guide for determining, first, 'whether alimony is necessary,' and, secondarily 'the nature, amount, and manner of' payments of the sum allowed as 'alimony.' *Many of*

*those factors have little relevance to a possible need for sustenance, e.g., the duration of the marriage, the standard of living of the parties established during the marriage, the property brought to the marriage by either party, the contribution of a spouse as homemaker, and the relative situation of the parties. On the other hand, those factors are quite pertinent to considerations of the distributions of marital assets and liabilities — the property settlement.*

"Only after a division of property is made, is the court statutorily authorized to consider whether an additional amount is needed for sustenance, and for what period will such necessity persist.

"Any grant of 'alimony' for sustenance is necessarily co-extensive with the court's determination that it is needed and warranted. Such authentication and supervision is accomplished through the continuing jurisdiction of the court." (Emphasis added.) *Id.* at 414, 75 O.O. 2d at 482, 350 N.E. 2d at 423.

The record discloses that appellant was awarded $2,337 per month in temporary alimony pending the parties' divorce. In the decree, appellee was awarded one year of sustenance alimony in the approximate amount of $1,000 per month for one year.

Appellant argues that appellee was not in need of the one-year sustenance award because she nets $300 weekly as a registered nurse and received $119,000 as her share of the marital property division. Appellant contends that appellee's salary and income generated from the property division provide a comfortable living and the court thus abused its discretion in awarding appellee sustenance alimony.

Appellee testified that her living expenses, including car payments, totaled approximately $500 per week. Appellee no longer resides in the marital residence. In making the prop-

erty division, the court could properly consider "the standard of living of the parties established during the marriage." R.C. 3105.18(B)(7). The parties resided in an upper-income neighborhood. The $119,000 property award presumably is available so that appellee may purchase a similar residence and continue to some degree to live in the standard of living established during the marriage to appellant. Should she choose to do so, the $119,000 is available to generate sustenance income.

The sustenance alimony is less than half the temporary alimony award and its duration is for only one year. Appellant makes a sizeable income and is in a position to meet the obligation. We do not find that the court abused its discretion in the sustenance alimony award. The assignment of error is overruled.

The appellant's fourth assignment of error states that the trial court abused its discretion in ordering appellant to pay excessive temporary alimony, and then refusing to grant a hearing to modify its order.

In this case, the court granted a temporary alimony award on April 10, 1986 after receiving affidavits of income and expenses from both parties. The court ordered the defendant to pay the plaintiff $150 in $10 per week installments to be put towards plaintiff's expenses of the suit. The court further ordered that the defendant pay the plaintiff $2,337 per month which was the amount of the mortgage/rent, taxes, insurance and basic utilities of the marital residence. If the plaintiff moved out of the marital residence, the defendant had to pay the plaintiff the $2,337 directly. If the plaintiff stayed in the marital residence, the defendant was given the option of discharging his duty by paying off the mortgage/rent, taxes, insurance and basic utilities of the marital residence directly.

Four months after the temporary order was filed and after two continuances on July 3, 1986 and August 11, 1986, the defendant filed a four-branch motion on August 13, 1986 which, in part, moved "for a modification of the temporary alimony award previously ordered for the reason that the plaintiff has caused delay of this matter by asking for a continuance of the trial on July 3, 1986 and again by failure to show for the trial on August 11, 1986." In the brief accompanying the motion, the defendant alleged that the plaintiff had moved out of the marital residence voluntarily in June 1986 and that the plaintiff had apparently withdrawn $28,000 from one of her personal checking accounts sometime subsequent to the filing of the complaint in March 1986.

The issue presented is whether or not the trial court erred in denying the motion made by the defendant on August 13, 1986. The Ohio Rules of Civil Procedure provide the standards which we must look to with regard to modification of temporary alimony decisions. Civ. R. 75(M) states:

"(1) When requested in the complaint, answer or counterclaim, or by motion served with the pleading, upon satisfactory proof by affidavit duly filed with the clerk of the court, the court or referee, without oral hearing and for good cause shown, may grant alimony pendente lite to either of the parties for his sustenance and expenses during the suit * * *.

"(2) Counter affidavits may be filed by the other party within fourteen days from the service of the complaint, answer, counterclaim or motion, all affidavits to be used by the court or referee in making a temporary alimony, child custody, support and care order; and, upon request in writing after any temporary alimony or child custody and support order is journalized, the court shall grant the party so requesting an oral hearing within twenty-eight days to modify such temporary order. A request for oral hearing shall not suspend or delay the commencement of alimony or support payments previously ordered or change the custody of children until the order is modified by journal entry after the oral hearing."

This rule delineates the manner in which an opposing party may contest a request for support by a counter affidavit within fourteen days and/or by motion to modify within twenty-eight days of a temporary order. *Davis* v. *Davis* (1983), 12 Ohio App. 3d 38, 12 OBR 125, 465 N.E. 2d 917.

Applying this rule to the situation in this case, it is evident that the defendant failed to follow the prescribed procedure. Defendant's first objection to the temporary order came well beyond the twenty-eight days called for by the state statute. This motion to modify came four months after the temporary order was entered.

The defendant further asserts that a change of circumstances existed when the plaintiff moved out of the marital residence and that this change justified a modification of the temporary award. While this might be considered a change of circumstances, the trial court, in setting the initial award, obviously foresaw such a change. "The change in circumstances must be substantial and must be such as was not contemplated at the time of the prior order." *Leighner* v. *Leighner* (1986), 33 Ohio App. 3d 214, at 215, 515 N.E. 2d 625, at 627. The temporary award of the trial court was set up to preserve the status quo between the parties for the duration of the trial. The trial court possessed sufficient foresight to provide for the foreseeable contingency that the plaintiff might move out of the marital house.

Appellant cites the difference between the permanent alimony award and the temporary award as another

factor in considering the validity of the temporary award. The fact that the permanent alimony award was less than the temporary award is not relevant evidence that the temporary award was unreasonable since the temporary award is no longer applicable once the permanent award is made. This information, therefore, was not available to the trial court when making its determination of temporary alimony.

Finally, appellant asserts that the trial court should have moved, *sua sponte,* for an oral hearing with regard to modifying the temporary alimony award after the defendant made it known that he disapproved of the award because of the delays in the trial. The responsibility for a failure to obtain an oral hearing does not lie on the trial court. The defendant failed to move within the twenty-eight days prescribed by Civ. R. 75(M). In addition, Local Rule 4.05 of the Montgomery County Court of Common Pleas, Division of Domestic Relations, states that:

"It is the responsibility of counsel for the party who seeks an oral hearing to obtain the date and time for such hearing from the office of the assignment commissioner and to give notice of the date and time of the oral hearing to the opposing party."

Since the appellant did not file for an oral hearing to modify the temporary alimony award within the prescribed time frame, he was properly denied such a hearing. Therefore, appellant's fourth assignment of error is overruled.

The judgment of the trial court is affirmed in part and reversed in part and this matter is remanded for further proceedings in accord with this opinion.

*Judgment accordingly.*

KERNS, P.J., and FAIN, J., concur.